IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| FAIRMONT PARTNERS, LLC, | ) | CASE NO. 18-82014-11 |
| EIN: XX-XXX2657 | ) | CHAPTER 11 |
| | ) | |
| Debtor. | ) | |

**<u>DEBTOR'S AMENDED MOTION: (I) FOR AUTHORITY TO SELL SUBSTANTIALLY ALL OF THE DEBTOR'S OPERATING ASSETS AND INTELLECTUAL PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES; (II) TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND LEASES AND TO ESTABLISH CURE COSTS IN CONNECTION THEREWITH; AND (III)TO ESTABLISH PROCEDURES WITH RESPECT TO SUCH SALE AND THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND LEASES</u>**

COMES NOW Fairmont Partners, LLC, as Debtor and Debtor-in-Possession ("<u>Debtor</u>"), by and through its undersigned counsel, pursuant to §§105(a), 363(f), and 1109(b) of the United States Code, 11 U.S.C. § 101, et seq. (the "<u>Bankruptcy Code</u>"), and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and moves this Court to enter an order authorizing the sale of substantially all of Debtor's assets (as defined below, the "<u>Identified Assets</u>"), free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing Debtor to assume and assign executory contracts and leases; and (III) approving the "<u>Sale Process</u>" and "<u>Bid Procedures</u>" set forth below. In support of this Motion, Debtor states as follows:

**<u>JURISDICTION AND VENUE</u>**

1.      On July 10, 2018 (the "<u>Petition Date</u>"), Debtor filed with the Clerk of this Court a voluntary petition for relief under Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"). Debtor continues to operate its business as Debtor in possession pursuant to §§ 1l07(a) and 1108.

2.     This Court has subject matter jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND

3.     Debtor is a privately held company headquartered in Sheffield, Alabama, and is engaged in the business of operating a hotel.  Debtor employs twenty-three (23) employees.

4.     Debtor's bankruptcy filing was precipitated by a variety of factors that have led to a deterioration of Debtor's business, including the impending foreclosure by the secured lender.

5.     Despite its best efforts, Debtor had no choice but to seek relief under chapter 11 of the Bankruptcy Code in order to preserve any going concern value.

6.     Pursuant to this Court's Order (*see* Doc 54), Debtor is directed to sell substantially all of its assets and provide, among other things, that (i) Access Point Financial Inc. or its affiliate (collectively, "APF") be the stalking horse bidder with an initial credit bid of $9,250,00.00, (ii) subsequent bids shall be made of no less than $50,000.00 per bid, (iii) APF shall have the right to increase its credit bid in accordance with section 363(k).

7.     By this Motion, Debtor asks this Court to approve the Sale Process and Bidding Procedures to be used in connection with the sale of the Identified Assets of the Debtor free and clear of all liens, claims, interests, and encumbrances.

## SALE PROCESS

8.     Pursuant to this Motion, Debtor seeks to sell all or substantially all of its assets (the "Identified Assets") to the highest and best bidder at an auction.  APF has submitted an initial bid, in the form of a credit bid against the obligations owed to it by Debtor, in the amount of $9,250,000.00, as evidenced by the Asset Purchase Agreement, attached hereto as Exhibit A.  Such

initial bid may be increased in the sole and absolute discretion of APF, up to the total amount of indebtedness due and owing to APF. For purposes of this Motion only, APF agrees that it will not seek to credit bid more than $10,200,000.00 at any auction for the Identified Assets. This Motion contemplates entry of an Order approving bidding procedures and, to the extent that there is more than one interested bidder, an auction process. After the auction process, this Motion contemplates that the parties would appear before the Court for a final hearing to approve the sale.

9.     Debtor seeks approval in order to sell the Identified Assets are as follows ("<u>Bidding Procedures</u>"):

    a.  <u>Initial Overbid</u>.  Any third party (other than APF) that is interested in acquiring the Identified Assets must submit an "Initial Overbid" in conformance with the Bid Procedures by not later than 5:00 p.m. local time in Huntsville, Alabama upon such date as shall be determine by the Court (the "<u>Overbid Deadline</u>"). Any such Initial Overbid must:

        i.  Contain a signed definitive asset purchase agreement that must: (1) provide for consideration to Debtor in an amount equal to or greater than the sum of (a) the consideration payable by APF under the Credit Bid, <u>plus</u> (b) cash in an amount equal to $50,000.00; (2) not be subject to any (a) financing contingency, (b) contingency relating to the completion of unperformed due diligence, (c) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (d) any conditions precedent to the overbidder's obligation to purchase the Identified Assets; and (3) provide that the overbidder shall purchase all or substantially all of the Identified Assets;

        ii.  Include a cashiers' or certified check in the aggregate amount of $250,000.00, payable to an independent escrow agent to be designated by Debtor (it being understood that deposits may also be sent by wire transfer of immediately available funds);

        iii.  To the extent not previously provided to Debtor, be accompanied by evidence satisfactory to the Debtor in its commercially reasonable discretion that the overbidder (1) is willing, authorized, capable, and qualified financially, legally, and otherwise, of unconditionally performing all obligations under its proposed purchase agreement, in the event that it submits the Prevailing Bid (as defined below) at the Auction, and (2) has substantial experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Identified Assets;

iv. Remain open and irrevocable until one hundred (100) days after the entry of an order by the Court approving a definitive agreement providing for the sale of the Identified Assets; and

v. Be submitted to (1) counsel to the Debtor, Stuart M. Maples, 200 Clinton Avenue West, Suite 1000, Huntsville, Alabama 35801, smaples@mapleslawfirmpc.com (2) counsel to APF, John F. Isbell, Thompson Hine LLP, 3560 Lenox Road, Suite 1600, Atlanta, Georgia 30326, john.isbell@thompsonhine.com; and (3) Office of the Bankruptcy Administrator, P.O. Box 3045, Decatur, Alabama 35602, Attention: Richard Blythe, in each case so as to be received not later than the Overbid Deadline.

b. <u>Auction</u>. In the event Debtor timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "<u>Qualified Bidder</u>"), then the Debtor will conduct an Auction with respect to the sale of the Identified Assets upon such date at 1:00 p.m., local prevailing time, at the offices of Maples Law Firm, PC, 200 Clinton Avenue West, Suite 1000, Huntsville, Alabama 35801. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bid Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bid Procedures Order. At the Auction, Qualified Bidders and APF (it being understood that APF shall be deemed to be a Qualified Bidder) may submit successive bids in cash or credit increments of at least $50,000.00 greater than the prior bid for the purchase of the Identified Assets until there is only one offer that Debtor determines (in the exercise of its sole discretion), subject to Court approval, is the highest or best offer for the Identified Assets (the "<u>Prevailing Bid</u>"). All bidding for the Identified Assets will be concluded at the Auction and there will be no further bidding at the Sale Hearing. If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Overbid Deadline, the Auction will not be held, APF shall be designated as the highest and best bid, and the Sale Hearing will proceed with respect to the Credit Bid on an expedited basis. In determining the Prevailing Bid, consideration will be given to, among other things: (i) the total consideration to be received by Debtor; (ii) the bidder's financial ability to close a transaction and the likelihood and timing thereof; (iii) the net benefit to Debtor's estate; and (iii) the amount of the bidder's experience acquiring, owning, rehabilitating and managing projects that are substantially similar to the Identified Assets. At the Auction, APF shall have the right to (i) submit further credit bids; and (ii) at any time, request that Debtor announces, subject to any potential new bids, the then current Prevailing Bid and, to the extent APF requests, use reasonable efforts to clarify any and all questions APF may have regarding Debtor's announcement of the then current Prevailing Bid. Only the persons who submitted Initial Overbids and APF may participate in the Auction. After the Auction has concluded, Debtor shall present the Prevailing Bid to the Court for consideration and approval at the Sale Hearing.

    c.   <u>Sale Hearing</u>.  The Sale Hearing will be conducted upon such date as shall be determine by the Court at the United States Bankruptcy Court, 3rd Floor Courtroom, Decatur, AL, at which time Debtor intends to present the Prevailing Bid for approval by the Court pursuant to the provisions of Sections 105, 363(b), 363(f), 363(m), 363(n), and 365 of the Bankruptcy Code.  Debtor shall be deemed to have accepted a bid only when the bid has been approved by the Court at the Sale Hearing.

    d.   <u>Highest and/or Best Bid</u>.  At all times during the proposed sale process, Debtor shall retain the right to determine, in its reasonable discretion, which bid constitutes the highest or otherwise best offer for the purchase of the Identified Assets, and which bid should be selected as the Prevailing Bid, if any, all subject to final approval by the Court pursuant to the provisions of Section 363(b) of the Bankruptcy Code.  Without limiting the generality of the foregoing, Debtor may, at any time before entry of an order of the Court approving a Prevailing Bid, reject any bid (other than APF's bid) that, in the reasonable discretion of Debtor, is determined to be (i) inadequate or insufficient, (ii) contrary to the requirements of the Bankruptcy Code or the Bid Procedures, (iii) from a bidder that does not have substantial experience acquiring, owning, rehabilitating, and managing projects that are substantially similar to the Identified Assets, or (iv) otherwise contrary to the best interests of Debtor, its estate, or its creditors.

    e.   <u>Sale Implementation</u>.  Following the approval of the Prevailing Bid at the Sale Hearing, Debtor will be authorized and directed to take all commercially reasonable and necessary steps to complete and implement the transaction(s) contemplated by the Prevailing Bid, including (but not limited to) seeking entry of one or more Sale Orders.

10.    A schedule of executory contracts and leases that APF intends to purchase (collectively, the "<u>Executory Contracts and Leases</u>") along with a list of applicable cure amounts, to the extent known ("<u>Cure Amounts</u>"), is attached hereto as <u>Exhibit B</u>.  After entry of this Order, Debtor shall serve a copy of this schedule, along with the order approving the Bidding Procedures, on all parties in interest, including counterparties to the Executory Contracts.

11.    Debtor requests that any counterparty to an Executory Contract that objects to the Sale or the amount of the Cure Amounts must file an objection, in writing, upon such date as shall be determine by the Court, setting forth the basis for its objection.

## NOTICE OF THE SALE

12.     Under Bankruptcy Rule 2002(a) and (c), Debtor requests that notice of the proposed sale of the Identified Assets, which it shall serve in conjunction with this Motion upon all creditors of the Debtor and those interested parties via electronic mail or U.S. mail, be deemed adequate and sufficient notice as required by the Bankruptcy Rules.

13.     Additionally, Debtor shall notice the sale of the Identified Assets by publishing notice of the sale in one or more local, reginal, and national publications.

## RELIEF REQUESTED

14.     By this Motion, Debtor requests the following relief:

a.     Approval of the Sale on the terms and conditions set forth herein;

b.     Approval of the Bidding Procedures as set forth herein;

c.     Approval of the assumption and assignment of the Executory Contracts and the Cure Amounts, as set forth herein;

d.     Approval of APF's credit bid as set forth herein; and

e.     Waiver of the 14-day stay provided for by Bankruptcy Rules 6004(h) and 6006(d).

## BASIS FOR RELIEF

15.     Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(I). A debtor-in-possession is given these rights by section 1107(a) of the Bankruptcy Code. 11 U.S.C. § 1107(a).

16.     Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

17.     Although Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the use, sale or lease of a debtor's assets, disposition of assets of a debtor should be authorized when there is an articulated business justification for doing so. *In re Gulf States Steel, Inc. of Ala.,* 285 B.R. 497, 515 (Bankr. N.D. Ala. 2002); *See also*, e.g., *In re Lionel Corp.,* 722 F. 2d 1063 (2nd Cir. 1983); *In re Titusville Country Club*, 128 B.R. 396 (Bankr. W.D. Pa. 1991); *In re Delaware & Hudson Railway Co.,* 124 B.R. 169, 176 (D. Del. 1991).

18.     Whether a transaction has a sufficient articulated business justification depends on the facts of the case. *See In re Continental Airlines, Inc.,* 780 F.2d 1223, 1226 (5th Cir. 1986). A bankruptcy court should consider "all salient factors pertaining to the proceeding and accordingly, act to further the diverse interests of Debtor, creditors and equity holders alike." *Id.; Lionel Corp.,* 722 F.2d at 1071. Relevant factors may include: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition on the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value." *See Continental Airlines*, 780 F.2d at 1226; *Lionel Corp.,* 722 F.2d at 1071; *In re Delaware & Hudson Railway Co.*, 124 B.R. at 176; *In re Condere Corporation,* 228 B.R. 615, 628 (Bankr. S.D. Miss. 1998).

19.     Courts have made it clear that a showing of a sound business justification need not be unduly exhaustive but, rather, a Section 363 movant is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.,* 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984); *see also In re Orion,* 4 F.3d 1095, 1099 (2nd Cir. 1993) ("[t]he business judgment test affords the trustee or debtor-in-possession broad discretion").

20.     Executory contracts may be assumed and assigned pursuant to 11 U.S.C. § 365, conditioned upon any defaults under the subject contracts being cured in connection with the assumption and assignment of such contracts.

21.     The relief requested by Debtor is in the best interests of the estate and the estate's creditors because the Sale of the Identified Assets as proposed herein will maximize the value of the assets of the Estate.  It does this by exposing the Identified Assets to the market through the offer from APF and by the solicitation of additional offers from other third parties.  There is no other means by which a creditor could obtain a greater value for the assets absent that creditor paying more for the assets in which case the purpose of obtaining the highest value for the Identified Asset is accomplished.

22.     In short, the sale proposed by Debtor is in the best interests of the estate and the creditors because it provides for a much larger amount of guaranteed money than simply liquidating the assets would produce.

WHEREFORE premises considered, Debtor respectfully requests that this Court enter an order authorizing Debtor to sell the Identified Assets free and clear of all existing properly perfected liens, interests, and encumbrances to the Qualified Bidder with the Prevailing Bid based on the terms and conditions set out in the Offer and granting it such other relief that this Court deems just and proper.

Respectfully submitted on October 19, 2018.

/s/ Stuart M. Maples
STUART M. MAPLES
(ABS-1974-S69S)

MAPLES LAW FIRM, PC
200 Clinton Avenue West, Suite 1000
Huntsville, Alabama 35801
Tel: (256) 489-9779
Fax: (256) 489-9720
smaples@mapleslawfirmpc.com

## CERTIFICATE OF SERVICE

I do hereby certify that on October 19, 2018, a copy of the foregoing document was served on the following by Electronic Case Filing a copy of the same.

Richard Blythe
*Bankruptcy Administrator*
P. O. Box 3045
Decatur, AL 35602

John F. Isbell
Alexandria Nelson
Thompson Hine LLP
3560 Lenox Road, Suite 1600
Atlanta, GA  30326
*Counsel for Access Point Financial, Inc.*

20 Largest Unsecured Creditors

All parties requesting notice

/s/ Stuart M. Maples
OF COUNSEL

# Exhibit "A"

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT ("***Agreement***") dated as of October 19, 2018 (the "***Effective Date***"), is made by and among Fairmont Partners, LLC, a Texas limited liability company ("***Seller***"), and Access Point Financial Inc., or its designated affiliate / assignee ("***Buyer***"). Seller and Buyer shall collectively be referred to as the "***Parties***".

## RECITALS

WHEREAS, Seller, as debtor and debtor-in-possession, filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "***Bankruptcy Code***") on July 10, 2018, in the United States Bankruptcy Court for the Northern District of Alabama *(the "**Bankruptcy Court**"),* and such bankruptcy case is administered under Case No. 18-82014-11 (*the* "***Bankruptcy Case***");

WHEREAS, the Seller wishes to sell, transfer, convey, assign and deliver to the Buyer, and the Buyer wishes to purchase, assume and acquire, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, the Property (as hereinafter defined), upon the terms and subject to the conditions set forth in this Agreement; and

WHEREAS, subject to the Bankruptcy Court's entry of the Sale Order (as hereinafter defined) and upon satisfaction of the covenants and conditions as set forth herein, the Buyer shall purchase from the Seller, and the Seller shall sell, transfer, convey, assign and deliver to the Buyer, the Property, upon the terms and subject to the conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual promises and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties mutually agree as follows:

SECTION 1 - THE PROPERTY. Seller agrees to sell and Buyer agrees to purchase all of Seller's right, title and interest in and to the following described property, except as otherwise expressly set forth herein:

(a)     The real property and improvements thereon located consisting of the land at the location generally known as 4900 Hatch Boulevard, Sheffield, AL 35660, and more particularly described on <u>EXHIBIT A</u> attached hereto, together with all buildings, improvements and other real estate fixtures, and all easements, appurtenant rights, privileges, reservations, rights-of-way, licenses and permits owned by the Seller and relating thereto (collectively, the "***Real Property***");

(b)     Personal property, including, without limitation, accounts receivable, goods, instruments, chattel paper, documents, general intangibles, contract rights, commercial tort claims, insurance, investment property, utility deposits, all gas and electric systems, lighting, heating and air conditioning equipment and systems, radiators, ventilator equipment, incinerators, furnaces, hot water heaters, water, sewage and plumbing systems, fire protection and security systems, furniture, machinery, apparatus and equipment, telephones, televisions,

bedding, bed linens, towels, window treatments, safety equipment, computer equipment and manuals, and all other fixtures and equipment attached to, located on, or related to the land and buildings and owned by the Seller and used in connection with the Real Property (collectively, "**Personal Property**");

(c)     All inventories of supplies owned by the Seller and used in connection with the operation of the Clarion (as hereinafter defined), including paper goods, brochures, office supplies, Unopened Food and Beverage Inventory (as hereinafter defined), and including chinaware, glassware, flatware, table linens, soap, gasoline, fuel oil, and other operational and guest supplies currently or subsequently located at the Clarion, subject to depletions, replacements and additions in the ordinary course of the operation of the Clarion (collectively, the "**Inventory**")

(d)     All software, patents, patent applications, processes, shop rights, formulas, brand names, trade secrets, servicemarks, tradenames, trademarks, copyrights, intellectual property, drawings, and any similar items and related rights owned by or licensed to the Seller and used or intended for use in connection with, or that are necessary to the continued conduct of the Real Property, together with any goodwill associated therewith and all rights of action on account of past, present, and future unauthorized use or infringement thereof (collectively, the "**Intellectual Property**");

(e)     All warranties and guarantees (the "**Guarantees**") issued to, in favor of, or in the name of, the Seller and given in connection with the construction or repair of the Real Property or the purchase of any Personal Property to the extent any such Guarantees are assignable and remain outstanding as of the Closing Date (as hereinafter defined);

(f)     All certificates of occupancy (or the local equivalent), permits, licenses, approvals and authorizations (collectively, "**Permits**"), to the extent such Permits are assignable, issued by any federal, state, county, municipal, governmental or quasi-governmental authority relating to the Real Property, including, without limitation, any liquor license issued to the Seller or any affiliate thereof and used in the operation of the Clarion (collectively, the "**Liquor Licenses**");

(g)     The Seller's right, title and interest in and to that certain Choice Hotels International, Inc. Franchise Agreement, dated May 15, 2018, by and between Choice Hotels International, Inc., a Delaware corporation, as franchisor ("**Franchisor**"), and Seller, as franchisee, with respect to the operation of a Clarion on the Real Property (as amended, modified, and/or assigned, the "**Clarion Franchise Agreement**"), but only to the extent such Clarion Franchise Agreement is transferrable;

(h)     All advance bookings or other confirmed reservations for accommodations, public functions, banquets, conferences, meetings, or other uses of any rooms in the Clarion for the period after the Closing Date, including agreements with outside booking agents and agreements with entities for corporate rates, as the same may be amended, cancelled or renewed (collectively, the "**Advance Bookings**" or "**Advance Booking Agreements**"), and all room reservation deposits, public function, banquet, conference, meeting, food and beverage deposits

and other deposits or fees for Advance Bookings applicable to the period after the Closing Date (collectively, the "***Advance Booking Deposits***");

(i)     The Seller's right, title and interest in and to the leases, licenses and other occupancy agreements encumbering the Real Property owned by the Seller, together with all amendments, supplements, modifications, assignments and guarantees thereof, all as more particularly described on <u>SCHEDULE 1</u> attached hereto (collectively, the "***Leases***");

(j)     All contracts and agreements, personalty leases, supply agreements, equipment or other lease licenses, government contract awards, management agreements, service agreements and executory contracts listed on <u>EXHIBIT B</u> to which the Seller is a party on the Closing Date or by which the Real Property is then bound, all as more particularly described on <u>SCHEDULE 2</u> attached hereto (collectively, the "***Contracts***"); and

(k)     The Seller's right, title and interest in and to all construction contracts, drawings, architectural renderings, and plans and specifications with respect to the Real Property (collectively, the "***Plans and Specifications***").

For purposes of this Agreement, the Real Property and all other or additional privileges, rights, interests, properties and assets of every kind and description and wherever located that are used or intended for use in connection with, or that are necessary to the continued conduct of the Real Property, including without limitation, the Personal Property, the Inventory, the Intellectual Property, the Guarantees, the Permits, the Clarion Franchise Agreement, the Advance Booking Deposits, the Leases, the Contracts and the Plans and Specifications, and all right, title and interest of the Seller in, to and under all of the business, properties, assets and goodwill of whatever kind and nature, real or personal, tangible or intangible, actual or contingent, which are owned or held by the Seller, are collectively referred to as the "***Property***."

<u>SECTION 2</u> - <u>CONSIDERATION</u>.  In exchange for the Property, Buyer agrees pay, in the form of a credit against the obligations owed to it by Seller, the amount of $9,250,000.00 ("***Consideration***").

<u>SECTION 3</u> - <u>ESCROW AND TITLE INSURANCE</u>.

3.1 - <u>Title/Survey</u>.     Promptly after the Effective Date, Buyer may order a title commitment ("***Commitment***") for the Real Property ("***Title Policy***").  Buyer shall have the right to order and obtain, at its sole cost and expense, a survey of the Real Property ("***Survey***"). On or before the Closing Date, Seller shall execute and deliver to the Title Company an owner's affidavit which will enable the Title Company to delete the standard printed exceptions from the Title Policy (the "***Owner's Title Affidavit***").

<u>SECTION 4</u> - <u>CONVEYANCE</u>.

On the Closing Date, Seller shall:

(a)     convey title to the Real Property owned by the Seller by quitclaim deed ("***Deed***"), free and clear of all liens, claims, interests and encumbrances, except the following (collectively,

"**Permitted Exceptions**"): (i) all real estate taxes and assessments, both general and special, not yet due and payable; and (ii) declarations, conditions, covenants, restrictions, easements, rights of way and other similar matters of record shown on the Commitments, which are approved or deemed approved by Buyer pursuant to Section 3.2 herein.

(b)    transfer the Seller's interest in the Personal Property, the Inventory, the Intellectual Property, the Guarantees, the Permits, the Contracts, the Advance Booking Deposits, and the Plans and Specifications owned by the Seller, which shall be effectuated through a General Assignment and Bill of Sale ("**Bill of Sale**").

(c)    transfer, to the extent possible, the Seller's interest in the Clarion Franchise Agreement, which shall be effectuated by an Assignment of Agreement ("**Assignment of Franchise Agreement**").

SECTION 5 - PRORATIONS AND CLOSING COSTS.

5.1 - Prorations.  Subject to the provisions of Section 7.2 hereof, all items of income and expense shall be paid, prorated or adjusted as of as of 12:01 AM on the Closing Date (the "**Proration Date**") in the manner hereinafter set forth:

(a)    All collected Rents (as hereinafter defined) shall be prorated between the Seller and the Buyer as of the Proration Date.  Seller shall be entitled to all collected Rents attributable to any period prior to, but not including, the Proration Date. Buyer shall be entitled to all collected Rents attributable to any period on and after the Proration Date. "**Rents**" shall mean all base rents, additional rent and any tax and operating expense reimbursements and escalations due from the tenants of the Real Properties under the Leases.

(b)    Operating Expenses (as hereinafter defined) for the Real Property shall be prorated as of the Proration Date.  Seller shall pay all utility charges and other operating expenses attributable to the Real Property, if any (collectively, the "**Operating Expenses**"), incurred prior to, but not including, the Proration Date (except for those Operating Expenses payable, whether actually paid or unpaid, by tenants for such tenant's leased premises in accordance with the Leases), and Buyer shall pay all Operating Expenses attributable to the Real Properties on and after the Proration Date. All Operating Expenses paid or payable by tenants in accordance with the Leases shall be allocated between Seller and Buyer, with Seller responsible for periods prior to, but not including, the Proration Date, and Buyer responsible for all periods on and after the Proration Date. Meters for all public utilities (including water) being used on the Real Property shall be ordered read by Seller on the day of giving possession to Buyer, and Buyer shall arrange with such services and companies to have accounts opened in Buyer's name beginning as of the Proration Date.

(c)    Any portion of the Taxes for the calendar year 2018 not yet due and payable shall be prorated between Seller and Buyer based upon the actual days of ownership of the parties for the year in which Closing occurs utilizing the most recent ascertainable tax bill(s).

(d)    Any and all costs, charges and expenses due and payable by Seller with respect to the Clarion Franchise Agreement shall be prorated as of the Proration Date, with Seller responsible for all such costs, charges and expenses with respect to the period prior to the

Proration Date, and Buyer responsible for all such costs, charges and expenses from and after the Proration Date.

(e)     Seller and Buyer shall prepare a closing settlement statement (the "***Closing Statement***") not less than one (1) day prior to the Closing Date that shall reflect the purchase and sale of the Property and all prorations and adjustments.  A copy of the Closing Statement shall be executed by Seller and Buyer and delivered to the Escrow Agent and/or the Title Company at the Closing.

5.2 - <u>Costs of Closing to be paid by Seller</u>.  Seller shall pay the following:

(a)     the fees and expenses of Seller's attorneys and other professionals.

5.3 - <u>Costs of Closing to be paid by Buyer</u>.  Buyer shall pay the following:

(a)     the cost to record the Deeds and any other instruments of transfer that are required to be recorded in connection with the transactions contemplated by this Agreement;

(b)     the cost of the Surveys;

(c)     the cost of any endorsements to Buyer's Title Policies (excluding the cost of any title endorsements required in connection with Seller's cure of the Objections); and

(d)     the fees and expenses of Buyer's attorneys.

Any other charges, costs or expenses incurred in connection with the transfers contemplated by this Agreement shall be split according to the local custom of the State of Alabama, except as set forth in Section 6 or Section 10, below.

<u>SECTION 6</u> - <u>POSSESSION AND CLOSING</u>.

6.1 - <u>Closing</u>.  The transaction contemplated herein shall be closed at the office of Thompson Hine, 3560 Lenox Road, Suite 1600, Atlanta, Georgia 30326 on or before 4 PM (Prevailing Eastern time) on or before December 7, 2018, subject to the terms and conditions to Closing expressly set forth in this Agreement.  The time and date of such closing is referred to herein as the "***Closing Date***" or the "***Closing***."

6.2 - <u>Closing Deliveries</u>.

(a)     To effectuate the Closing, the Seller shall execute and deliver to Buyer the following:

(i)     a Deed duly executed by the Seller for the Real Property;

(ii)    the Assignment of Leases;

(iii)   the Bill of Sale;

(iv)     to the extent possible, the Assignment of Clarion Franchise Agreement;

(v)     a certificate executed by the Seller certifying the truth, completeness and accuracy of the representations and warranties of the Seller, as of the Closing Date;

(vi)     a completed 1099-S request for taxpayer identification number and certification and acknowledgment duly executed by the Seller;

(vii)     the Owner's Title Affidavit duly executed by the Seller;

(viii)     resolutions of the Seller, or other evidence reasonably satisfactory to the Buyer, authorizing the sale of the Property pursuant to this Agreement and the authority of the officer executing the closing documents on behalf of the Seller;

(ix)     the Closing Statement;

(x)     trademark, patent and domain name assignments in a form reasonably satisfactory to the Buyer and its counsel and the Seller and its counsel, pursuant to which the Seller shall assign the Intellectual Property to the Buyer (the "***IP Assignments***"); and

(xi)     such other instruments reasonably required to consummate the transaction contemplated by this Agreement, including without limitation any transfer and conveyance forms required for the transfer of property in Alabama.

(b)     To effectuate the Closing, Buyer shall deliver to Seller the following:

(i)     the Bill of Sale;

(ii)     to the extent possible, the Assignment of Clarion Franchise Agreement;

(iii)     the Assignment of Leases;

(iv)     the Closing Statement;

(v)     the Consideration;

(vi)     such other instruments reasonably required to consummate the transaction contemplated by this Agreement, including without limitation any transfer and conveyance forms required for the transfer of property in Alabama.

(c)     Unless otherwise expressly provided herein, all documents necessary for Closing shall be deposited in escrow at least one (1) business day prior to the Closing Date.  At Closing:

(i)     the Deed shall be delivered to Buyer by filing the Deed in the public records for the jurisdiction in which the Real Property is located; and

(ii)     Buyer shall deliver to Seller confirmation of the Consideration.

(d)     Seller shall deliver exclusive possession of the Property to Buyer at the Closing.

4811-6314-8152.4

6.3 - <u>Post-Closing Deliveries; Further Assurances</u>.  To the extent not already delivered to Buyer, within five (5) business days following the Closing, Seller shall deliver or cause to be delivered to Buyer, at Seller's sole cost and expense, copies of all files and records in Seller's possession relating to the operation and maintenance of the Property.  To the extent not already delivered to Buyer, Seller shall also deliver to Buyer promptly following the Closing originals or copies of Permits relating to the Real Properties and originals or copies of all Plans and Specifications relating to the Real Properties. The Buyer and the Seller shall, at any time and from time to time after the Closing Date, upon the reasonable request of the other, execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered, all such further (a) assignments, transfers and conveyances as may be required for assigning, transferring, granting, conveying and confirming the transactions contemplated hereby, including aiding and assisting the Buyer in collecting and reducing to possession any or all of the Property and (b) documents and instruments as may be reasonably necessary for the further completion of any of the transactions contemplated hereby.

6.4 - <u>Covenants of Seller Pending Closing</u>.

(a)    From the Effective Date through the Closing Date, Seller shall not modify, cancel, extend or otherwise change in any manner, the terms, covenants or conditions of any insurance policy insuring the Real Property, nor enter into any contracts for services or otherwise that may be binding upon the Real Property or upon Buyer, nor shall any easements be created or any leases, easements, licenses or encumbrances given on the Real Property, nor shall Seller amend, modify, or terminate any Lease or any of the Contracts, nor shall any legal action be taken in connection with the Real Property, without the express prior written consent of Buyer.

(b)    From the Effective Date through the Closing Date, Seller shall continue to operate the Real Property in substantially the same manner as Seller had prior to the Effective Date and shall:  (i) at its expense, maintain the Real Properties in good condition, normal wear and tear excepted, and consistent with other similar properties in the Sheffield, Alabama area; (ii) give prompt notice of any fire or other casualty affecting the Real Property after the Effective Date; (iii) deliver to the Buyer, promptly after receipt by the Seller, copies of all notices received the Seller relevant to any of the Property, including, without limitation, notices of violation issued by governmental authorities with respect to the Real Property received by Seller after the Effective Date; and (iv) promptly notify the Buyer of any material change in the facts known to the Seller underlying any representation or warranty in this Agreement and of any material change in the condition or status of the Real Property.

(c)    Seller shall maintain all Permits, including, without limitation, the Liquor Licenses, and use commercially reasonable efforts to cause all of same that are scheduled to expire prior to the Closing Date to be renewed.  Seller shall maintain the Liquor Licenses used in connection with the Clarion (including, without limitation, paying any fees, costs and expenses incurred in connection therewith), and if any of the Liquor Licenses are scheduled to expire prior to the Closing Date, Seller shall take all steps necessary to renew them, at Seller's cost and expense. If any of such licenses and permits shall be suspended or revoked, to the extent Seller has any remaining legal rights as licensee in connection therewith, Seller shall promptly notify Buyer and shall take all measures necessary to cause the reinstatement of the same.  To the extent that the consent of any governmental authority is required with respect to the transfer of

any of the licenses and permits to Buyer, including the Liquor Licenses, Seller shall cooperate in good faith with Buyer in seeking and obtaining any such required consent.

(d)     Seller shall maintain its books of account and records for the Property in its usual and ordinary manner, in accordance with sound accounting principles applied on a basis consistent with the basis applied by Seller in maintaining its books and records in prior years.

(e)     Seller shall not remove or cause to be removed from the Property any part or portion of the Personal Property unless the same is replaced, at or prior to Closing, with similar items of at least equal suitability, quality and value; provided, that the Inventory may be used and replenished in accordance with Seller's normal business practices, at Seller's sole cost and expense.

(f)     Seller shall promptly advise Buyer in writing if Seller has been served with any litigation or arbitration complaint concerning or affecting the Property and with copies of any notices received by any governmental authority.

6.5 - <u>Conditions Precedent to Closing</u>.

(a)     In favor of Seller. The following shall be conditions precedent to Seller's obligation to proceed to Closing:

(i)     Seller shall obtain the Sale Motion and the Sale Order (hereinafter defined) providing for, among other things, approval of the Buyer as stalking horse and other rights and protections satisfactory to the Buyer in its sole discretion (collectively, "***Seller's Approval***").

(ii)     Buyer shall have performed, observed, and complied with all of the covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with by Buyer at or prior to Closing.

(b)     In favor of Buyer.  The following shall be conditions precedent to Buyer's obligation to proceed to Closing:

(i)     No material adverse change shall have occurred with respect to the Property.

(ii)     All representations and warranties of the Seller contained in this Agreement  shall be true in all respects at and as of the Closing and Seller shall have performed, observed and complied with all of the covenants, agreements and conditions required by this Agreement to be performed, observed and complied with by Seller at or prior to Closing.

(iii)     Buyer will have obtained consent from the appropriate governing jurisdiction to the transfer of the Liquor Licenses to Buyer at Closing, such consent to be in form and substance satisfactory to Buyer in its sole and absolute discretion.  The costs and expenses, including, without limitation, any transfer fee or application fees, of obtaining such consent will be borne by Buyer.

(iv)     Seller obtains and delivers to Buyer a copy of Seller's Approval.

(v)     The Bankruptcy Case shall not have been dismissed, nor converted into a case under Chapter 7 of the United States Bankruptcy Code, nor shall any trustee or examiner be appointed with respect to the Bankruptcy Case.

(vi)     All conditions set forth in Section 6.6, below, shall be satisfied as determined by the Buyer in its sole and absolute discretion.

If the conditions set forth in this <u>Section 6.5(b)</u> above are not satisfied by Seller or waived by Buyer (in its sole and absolute discretion) in writing at or prior to Closing, then Buyer shall have the right to terminate this Agreement by providing written notice to Seller, and none of the Parties hereto shall have any further obligations under this Agreement, except for the obligations that expressly survive the termination of this Agreement.

6.6 -  <u>Bankruptcy Provisions</u>

(a)     <u>Bid Procedures, Auction, Sale Hearing, Sale Order.</u>

i.     Within two (2) business days from the date of this Agreement, Seller shall file a motion in the Bankruptcy Case to approve this Agreement (the "***Stalking Horse Motion***"), in form and substance acceptable to Buyer in its sole and absolute discretion.

ii.     Within seven (7) days from the filing of the Stalking Horse Motion, Seller shall obtain from the Bankruptcy Court an Order granting the Stalking Horse Motion in form and substance acceptable to Buyer in its sole and absolute discretion ("***Bidding Procedures Order***").

iii.     Any entity wishing to submit a bid for the purchase of the Property, or any portion thereof, must submit a bid and be determined to be a Qualified Bidder, as that term is defined in the Bidding Procedures Order, on or before November 28, 2018 ("***Bid Deadline***").

iv.     If a person or entity making a bid is determined to be a Qualified Bidder by Seller before the expiration of the Bid Deadline, an auction shall occur on December 3, 2018, as set forth in the Bidding Procedures Order.

v.     The Bankruptcy Court shall conduct the Sale Hearing (as that term is defined in the Bidding Procedures Order) on or before December 5, 2018.

vi.     Seller shall obtain, by December 6, 2018, an order from the Bankruptcy Court, in form and substance acceptable to Buyer in its sole and absolute discretion that, among other things: (i) grants the Sale Motion; (ii) authorizes the sale of the Property free and clear of all liens, claims, interests, and encumbrances; (iii) finds that Buyer is a good faith purchaser pursuant to 11 U.S.C. § 363(m); (iv) orders that Buyer is not subject to liability under, nor is the sale avoidable under, 11 U.S.C. § 363(n) (the "***Sale Order***").

vii.     The Sale Order shall also include provisions, pursuant to 11 U.S.C. § 365 and in form and substance acceptable to Buyer in its sole and absolute discretion that provides, among other things, that the Contracts listed on Exhibit B (in final form, as set forth herein) as of

the Closing Date are assumed by Seller and assigned to Buyer, with all defaults, if any, cured in all respects.

(b)     From the date of execution of this Agreement through the entry of the Sale Order (hereinafter defined), Seller shall not terminate or reject any executory contract or lease unless otherwise agreed to in writing by Buyer in advance.

SECTION 7 – PROVISIONS REGARDING HOTEL PROPERTIES.

7.1 - General.

(a)     As of the Effective Date, Seller owns and operates a Clarion hotel on the Real Property (the "*Clarion*").

(b)     With respect to the Clarion, Seller shall have the right to continue to make and accept reservations for the rooms, banquet, restaurant, meeting and other facilities (and to accept deposits for and cancellations of such reservations) in the ordinary course of Seller's business, at Seller's customary practices, rates and charges, and Buyer agrees to honor and assume all such reservations following the Closing.

(c)     Effective as of the Closing Date, Seller will reject and terminate any property management, leasing, or other similar agreements with respect to the Clarion, at Seller's sole cost and expense.  Buyer and Seller acknowledge and agree that from and after the Closing Date, Buyer shall have no liability with respect to any such agreements, and in the event that a termination fee, claim, or other charge or expense is incurred by Seller in connection with any such termination, Seller shall be solely responsible for any such fees, costs, and expenses.

7.2     Prorations Specific to the Clarion.

(a)     Room charges, including mini-bar and entertainment rentals and overnight parking charges, if any, for the night commencing on the Proration Date and ending on the morning of the Closing Date shall be split 50-50 between Seller and Buyer. Meal, bar, room service charges, revenues from facsimile, data communications, laundry, vending machine revenue, telephone, internet and other revenue and service charges, and all other revenue actually received from whatever source relating to the Clarion (i) for the period of time prior to the Proration Date shall be the property of Seller, and (ii) for the period of time on or after the Proration Date shall be the property of Buyer. Hotel, restaurant, lounge, and tourist room or occupancy taxes and similar charges imposed by state or local authorities with respect to payments made by guests and other customers of the Clarion for rooms, food and beverage, and other services shall be payable by the party which, pursuant to this Agreement, is entitled to receive the revenues from the rooms, goods or services to which such taxes relate. All cash and cash equivalents on the premises of the Clarion as of the Closing Date, whether in the cash register, safe, donation box or otherwise, shall belong to Buyer.

(b)     The parties acknowledge that certain other taxes ("*Other Taxes*") accrue and are payable to the various local governments by any business entity operating a hotel and its related facilities.  Included in those Other Taxes may be business and occupation taxes, retail sales taxes, gross receipts taxes, and other special lodging or hotel taxes.  For purposes of this Agreement, all

- 10 -

of such Other Taxes (expressly excluding Taxes covered elsewhere in this Agreement) shall be allocated between Seller and Buyer such that those attributable to the period prior to the Proration Date shall be allocable to Seller and those attributable to the period on or after the Proration Date shall be allocable to Buyer (with the attribution of such Other Taxes hereunder to be made in a manner consistent with the attribution under this Agreement of the applicable revenues on which such Other Taxes may be based). Seller shall be solely responsible for payment of such Other Taxes with respect to the period prior to the Proration Date, and Buyer shall be solely responsible for payment of such taxes with respect to the period on or after the Proration Date.

      7.3    <u>Unopened Food and Beverage Inventory</u>. Buyer and Seller acknowledge and agree that included within the Consideration is the full amount of all Unopened Food and Beverage Inventory (as hereinafter defined), owned by Seller and located on or used in connection with the Clarion as of the Proration Date. As used herein, "***Unopened Food and Beverage Inventory***" means any unopened goods (including, without limitation, food and beverages) held for sale at the Clarion. As used herein, "unopened" means, with respect to any product (including bottles and food packaging), that such product remains sealed in its original and final container and may be returned to the vendor for credit and resale.

      7.4    <u>Advance Booking Deposits</u>. On the Closing Date, the aggregate amount of any Advance Booking Deposits held by or on behalf of Seller and applicable to any period from and after the Proration Date shall belong to Buyer.

      7.5    <u>Safes and Baggage</u>. Seller shall record all contents of any safe located on the Clarion as of 10:00 A.M. on the Closing Date. From and after the Closing Date, the contents of any safe on any of the Clarion which are recorded by the Seller and all items deposited thereafter shall be the responsibility of Buyer. From and after the Closing Date, Buyer shall be responsible to guests for all baggage stored at the Clarion.

<u>SECTION 8</u> – <u>DUE DILIGENCE</u>.

      8.1 -  <u>Inspections; Review of Commitment and Survey</u>.

      (a)    Buyer shall have until 12:00 PM Eastern Time on the Closing Date to conduct Inspections (as hereinafter defined) of the Property (the "***Due Diligence Period***"). Seller shall permit Buyer and Buyer's representatives to enter the Real Property at any time for the purpose of conducting inspections and investigations reasonably required by Buyer in order to determine the suitability of the Real Property for Buyer's purposes (collectively, the "***Inspections***"). Seller will cooperate with Buyer to facilitate the Inspections. Buyer shall use commercially reasonable efforts to initiate its Inspections and to diligently pursue the same to completion.

      (b)    If the results of the Inspections are not acceptable to Buyer, in its sole discretion, Buyer may terminate this Agreement by written notice given to Seller prior to the expiration of the Due Diligence Period, in which event none of the parties hereto shall have any further rights or obligations hereunder except for obligations that specifically survive the termination of this Agreement.

<u>SECTION 9</u> - <u>REPRESENTATIONS AND WARRANTIES</u>.

9.1 - <u>By Seller</u>.

(a)    Seller represents and warrants to Buyer that the following are true and correct as of the date hereof and shall be true and correct at the date of the Closing:

(i)    Seller is duly created and validly existing pursuant to the laws of the jurisdiction of its organization and is duly qualified to do business in the State of Alabama.

(ii)    Seller has the capacity and authority to execute this Agreement and perform the obligations of Seller under this Agreement.

(iii)    Seller has not received written notice from any governmental authority alleging that the Real Property is in violation of applicable laws, ordinances or regulations, including applicable environmental laws, rules, regulations and orders.

9.2 - <u>By Buyer</u>.

(a)    Buyer represents and warrants to Seller as of the Effective Date that:

(i)    Buyer is duly created and validly existing pursuant to the laws of the jurisdiction of its organization and is duly qualified to do business in the jurisdiction in which the Property is situated if and to the extent that such qualification is required.

(ii)    Buyer has the capacity and authority to execute this Agreement and perform the obligations of Buyer under this Agreement.

<u>SECTION 10</u> <u>DEFAULT</u>.

10.1 - <u>Seller Default</u>.  Notwithstanding any provision in this Agreement to the contrary, if Closing does not occur by reason of a breach or default by Seller and continues for five (5) days after written notice from Buyer ("***Cure Period***"), then Buyer may, in its sole and absolute discretion, terminate this Agreement.  Thereafter, none of the Parties shall have any further rights or obligations hereunder except for obligations that specifically survive the termination.

10.2 - <u>Buyer Default</u>.  Notwithstanding any provisions of this Agreement to the contrary, if Buyer fails to close this transaction for reasons other than Seller's default or the failure of any of the express conditions to Buyer's performance, and such failure continues for five (5) days after written notice from Seller, then this Agreement shall terminate, and Seller shall have no claim to damages against Buyer.

<u>SECTION 11</u> - – <u>CASUALTY</u>.  If prior to the Closing Date, building(s) comprising a part of the Real Property or other Property, are destroyed by fire or other casualty, Seller shall notify Buyer in writing of such fact (which writing shall detail the amount of such damage as determined by a reputable public adjusting firm, together with the amount of insurance proceeds recoverable), and Buyer shall have the option to terminate this Agreement upon notice to Seller.  Upon such termination, this Agreement shall terminate and none of the parties hereto shall have any further obligation or liability to the other except for obligations that specifically survive termination of this Agreement.  In the event Buyer does not so elect to terminate this Agreement, Seller shall

assign to Buyer any insurance claims, and Buyer shall acquire the Property pursuant to this Agreement.

SECTION 12 - MISCELLANEOUS.

12.1 - Governing Law/Venue.  This Agreement shall be governed by the laws of the State of Alabama.  Venue shall be in the Bankruptcy Court.

12.2 - Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.   Return of an executed counterpart of this Agreement by electronic mail transmission shall bind the party so executing and delivering such counterpart.

12.3 - Entire Agreement.  This Agreement, together with the attached exhibit(s), contains all of the terms and conditions of the agreement among the parties hereto, and any and all prior and contemporaneous oral and written agreements are merged herein.

12.4 - Modifications and Waivers.  This Agreement cannot be changed nor can any provision of this Agreement, or any right or remedy of any party, be waived orally.  Changes and waivers can only be made in writing, and the change or waiver must be signed by all parties hereto.  Any waiver of any provision of this Agreement, or any right or remedy, given on any one or more occasions shall not be deemed a waiver with respect to any other occasion.

12.5 - Parties Bound.  This Agreement shall be binding upon and inure to the benefit of the heirs, executors, successors, and assigns of the parties hereto.

12.6 - Assignment.  Buyer may assign its rights and obligations under this Agreement without the consent of Seller.

12.7 - Notices.  All notices, requests and other communications under this Agreement shall be in writing and shall be deemed given when made by personal delivery, next or second business day by delivery by a nationally recognized overnight courier, addressed as follows, or electronic mail followed by another permitted means of delivery.  Notice shall be deemed given on the date on which the notice is received by a party in the case of personal delivery or electronic mail, or on the next or second (whichever is applicable) business day immediately following receipt by the courier, in the case of an overnight courier:

If to Buyer:      Thompson Hine LLP
                  Two Alliance Center
                  3560 Lenox Road, Suite 1600
                  Atlanta, Georgia 30326
                  Attn:  John F. Isbell
                  email:  john.isbell@thompsonhine.com

If to Seller:     MAPLES LAW FIRM, PC
                  200 Clinton Avenue West, Suite 1000

Huntsville, Alabama 35801
Attn: Stuart M. Maples
email: smaples@mapleslawfirmpc.com

Notice by any party hereto may be given by its counsel.

12.8 - <u>Section Headings</u>.  The captions in this Agreement are for convenience only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

12.9 - <u>Severability</u>.  If one or more of the provisions of this Agreement or the application thereof shall be invoked, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions or any other application thereof shall in no way be affected or impaired.

12.10 - <u>Time of the Essence</u>.  The parties agree that time is of the essence and that the failure of a party hereto to perform any act on or before the date specified herein for performance thereof shall be deemed cause for the termination hereof by the other party, without prejudice to other remedies available for default hereunder.

12.11 - <u>Further Action</u>.  The parties hereto shall at any time, and from time to time on and after the Closing Date, upon the request of either, do, execute, acknowledge and deliver all such further acts, deeds, assignments and other instruments as may be reasonably required for the consummation of this transaction.

12.12 - <u>Construction</u>.  This Agreement shall not be construed more strictly against one party than against another merely by virtue of the fact that it may have been prepared by counsel for one of the parties hereto, it being recognized that both Seller and Buyer have contributed substantially and materially to the preparation of this Agreement.

12.13 - <u>No Recording</u>.  Neither this Agreement nor any memorandum or short form thereof may be recorded by Buyer.

12.14 - <u>Third Party Beneficiary</u>.  The provisions of this Agreement are not intended to nor shall benefit any parties other than Seller and Buyer.

12.15 - <u>Business Day</u>.  As used herein, a business day shall mean any day other than Saturday, Sunday, or other day that commercial banks in the State of Alabama are authorized or required to close under applicable law.  In the event that the expiration of any time period hereunder, shall expire on a Saturday, Sunday or legal holiday, then such time period shall be extended until the close of business on the next following business day.

(Remainder of page intentionally left blank)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed on the respective dates specified below.

**SELLER:**

Fairmont Partners, LLC,
a Texas limited liability company,

By _____

Printed Name: TRACY SUTTLES

Title: MGR


**BUYER:**

Access Point Financial Inc.


By: _____

Printed Name: DILIP R. PETLONGA

Title: COO

EXHIBIT "A"

(legal description)

A tract of land lying in Colbert County, State of Alabama, in Sections 26 and 27, Township 3 South, Range 11 West, along the southeast side of the right of way of the L & North and Southern Railroads near the southwest corner of the Muscle Shoals Reservation, and more particularly described as follows:

Beginning at a metal marker (Coordinates: N 1,732009; E 448,125) in the boundary of the United States of America's land where the southeast line of the 100-foot wide right-of-way for the L & N and Southern Railroads intersects a line 50 feet north of and parallel to the center line of a single track railroad owned by the United States of America; thence with the United States of America's boundary line and with the said southeast line of the right of way for the L & N and Southern Railroads, a line 50 feet southeast of and parallel to the center line of the said right of way on a curve having a radius of 5444.80 feet as it curves to the left in a northeasterly direction 416 feet (Chord bearing and distance being North 38° 52' East, 415 feet) to the point of compound curvature where the radius of the curve changes and becomes 5840.20 feet; thence on the curve having a radius of 5840.20 as it curves to the left in a northeasterly direction 385 feet (Chord bearing and distance from the point of compound curvature being North 34° 41' East, 385 feet) to a metal marker; thence leaving the United Stated of America's boundary and the railroad right of way line, South 85° 24' East 954, feet to a metal marker; thence South 4° 36' West, 550 feet to a metal marker; thence North 85° 24' West, 712 feet to a metal marker in the east line of the right of way for Wilson Dam-Barton 46-KV Transmission line; thence South 85° 40' West, 142 feet to a metal marker in a line 50 feet north of and parallel to the center line of a single track railroad owned by the United States of America; thence with the said line that is parallel to the center line railroad track on a curve having a radius of 1162.85 feet as it curves to the left in a westerly direction 273 feet (Chord bearing and distance being North 88° 44' West 272 feet) to the point of compound curvature where the radius of the curve changes and becomes 860.18 feet; thence on the curve having a radius of 860.18 feet as it curves to the left in a westerly direction 272 feet (Chord bearing and distance from the point of compound curvature being South 75° 37' West, 271 feet) to the point of beginning.